COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Frank and Kelsey
Argued at Richmond, Virginia


KEY RISK INSURANCE COMPANY

OPINION BY
v.        Record No. 2567-11-2        CHIEF JUDGE WALTER S. FELTON, JR.
JUNE 19, 2012
JOSEPHINE H. CREWS, EXECUTRIX
 OF THE ESTATE OF JAMES E. CREWS


FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

> Robert M. Himmel (Christopher M. Kite; Lucas & Kite, PLC, on
> briefs), for appellant.
>
> Archibald Wallace, III (Thomas J. Moran; WallacePledger, PLLC,
> on brief), for appellee.


Key Risk Insurance Company ("insurer") appeals from a decision of the Virginia

Workers' Compensation Commission ("commission") awarding compensation benefits to

Josephine H. Crews ("claimant"), the sole dependent of James E. Crews ("decedent"), who died

in a work-related accident.  Insurer asserts the commission erred in awarding claimant

compensation calculated at the minimum weekly wage rate of $223.75, arguing there was no

evidence before the commission that decedent earned any wages in the fifty-two weeks

preceding his death.  Claimant assigns cross-error to the commission's decision, contending that

the commission erred by not calculating decedent's average weekly wage based on the following

testimony:  (i) that decedent worked seventy to eighty hours per week; (ii) that decedent

withdrew money each week from his business, a sole proprietorship, to pay for personal and

other expenses; and (iii) that claimant paid wages to other employees to perform some of

decedent's work after he died.

I.  BACKGROUND

"We view the evidence on appeal in the light most favorable to [claimant], the prevailing party before the commission." Dunnavant v. Newman Tire Co., 51 Va. App. 252, 255, 656 S.E.2d 431, 433 (2008).

Evidence presented to the deputy commissioner proved that decedent, a self-employed individual, was the sole proprietor for Crews Home Sales, a business engaged in the sale and delivery of prefabricated homes.  On July 23, 2009, decedent died in a motor vehicle accident while transporting a prefabricated home to West Virginia.

Claimant, decedent's widow, filed a claim for compensation benefits and funeral expenses on August 5, 2009.  At the hearing before the deputy commissioner on August 20, 2010, the parties agreed that the death presumption[1] applied, that claimant was decedent's sole dependent, that the accident occurred as described in the state trooper's accident report and deposition testimony, that decedent's death occurred in the course of his employment, and that decedent's death arose out of his employment, subject to insurer's defense of willful misconduct.[2]  The parties disputed whether decedent had an average weekly wage and the amount of any average weekly wage.

---

[1] Under certain circumstances, Virginia courts have granted claimants a presumption that the employee's death arose out of and in the course of employment.  The presumption applies to those instances where an employee

> is found dead . . . at his place of work or near-by, where his duties
> may have called him during the hours of his work, and there is no
> evidence offered to show what caused the death or to show that he
> was not engaged in his . . . business at the time.

Southern Motor Lines Co. v. Alvis, 200 Va. 168, 171, 104 S.E.2d 735, 738 (1958).

[2] Insurer did not appeal the deputy commissioner's finding that decedent did not engage in willful misconduct.

Claimant worked as a bookkeeper and general manager for decedent's sole proprietorship. She testified that, because decedent was a sole proprietor and did not collect a salary, she and decedent established a "draw account" from which decedent paid himself each week. She testified that decedent withdrew monies each week from that account, from the time he bought the business in 1991 until his death in 2009.

Claimant explained that the sole proprietorship generated annual profits from 1991 to 2007 and that, during that time, decedent's draws from the business account constituted his wage earnings. From 2007 until his death in 2009, however, the sole proprietorship operated at a loss.[3] During that time, any money decedent withdrew from the draw account, either for himself or for personal and family expenses, was treated as a loan from the business. Claimant conceded that the Crewses' 2008 joint federal income tax return did not reflect any wages for decedent because his weekly draws merely constituted loans from the sole proprietorship. Accordingly, claimant confirmed, there was no earned income to report on the tax return as wages. Claimant also conceded that the 2008 and 2009 joint federal income tax returns indicated that the sole proprietorship operated at a loss and that it had continued to operate at a loss after decedent's death.[4]

---

[3] Claimant testified that the sole proprietorship, which was engaged in the business of selling new fabricated homes, began operating at a loss in 2007 because of the collapse of the financial market.

[4] We note that the Virginia Workers' Compensation Act ("the Act") equates "wages" with "earnings," Bay Concrete Constr. Co. v. Davis, 43 Va. App. 528, 539, 600 S.E.2d 144, 150 (2004), but does not equate "wages" and "earnings" with "income," B.P. Solar & Ace Am. Ins. Co. v. Jones, 49 Va. App. 322, 326-27, 641 S.E.2d 124, 126 (2007) (affirming the commission's refusal to equate earnings with income, where claimant's disability benefits were a form of income, but were not earnings as contemplated by Code § 65.2-712); see also Code § 65.2-101; Smith v. Smith, 32 Va. App. 242, 255, 527 S.E.2d 463, 470 (2000) (recognizing that business profits, while considered income, were not earnings under the Act).

This Court has previously held that "wages," or "earnings," is a term applied to compensation paid to an employee as consideration for work, which constitutes a real economic gain to the employee. Southwest Architectural Products, Inc. v. Smith, 4 Va. App. 474, 480, 358 S.E.2d 745, 748 (1987).

Leslie Robson, a forensic accountant, testified for insurer. He stated that he reviewed Schedule C of the Crewses' 2008 and 2009 joint federal income tax returns, which reflected the income and expenses for the sole proprietorship.[5] He told the deputy commissioner that he analyzed that information on both a "net income or loss level" and on a "cash flow level." He testified that, based on a net income or loss analysis, the sole proprietorship generated a net loss during 2008 and 2009 and, because it operated at a net loss, decedent did not collect any wages during that period. He stated that the business generated an $8,146 operating cash flow deficit for 2008 and a $21,148 cash flow deficit for 2009, based on an operating cash flow analysis. He testified that analysis reflected revenues, including depreciation, minus cash expenses paid. Based on these cash flow deficits, Robson again concluded that the sole proprietorship generated no profits during those periods and that decedent did not receive any wages from employment. Robson confirmed on cross-examination that decedent received no wages from employment during the relevant time frame, regardless of which approach Robson used to calculate the sole proprietorship's finances.

Robson's report dated August 6, 2010 stated:

> Based upon our analysis, we found no evidence supporting the wages represented on [decedent's] wage worksheets. Instead, we found that the records supported no wages at all.
>
> As a self-employed individual, [decedent's] wage consisted of the profit or cash flow he generated from his efforts operating Crews Home Sales & Transport. Based on our analysis of [decedent's] income 2008 and 2009 income tax returns, his business did not generate any profits or positive cash flow in either year. To the contrary, during 2008 the business generated a $21,642 net loss and $8,146 of negative cash flow (Schedule 2). The 2008 weekly averages were a $416 weekly net loss and $157 of weekly negative cash flow (Schedule 1). During the period January 1 [through]

---

[5] Robson also reviewed an account quick report reflecting decedent's capital draws from January 1, 2008 to July 23, 2009, as well as "wage charts" prepared by claimant after decedent's death, reflecting his weekly draws from the business from July 19, 2007 to July 15, 2009.

- 4 -

July 23, 2009 the business generated a $22,805 net loss and
$21,148 of negative cash flow. The January through July 2009
weekly averages were a $727 weekly net loss and $784 weekly
negative cash flow. *The combined weekly averages for January 1,
2008 through July 23, 2009 were a $361 net loss and $548 of
negative cash flow* (Schedule 1).

(Emphasis added).

The deputy commissioner found that the evidence presented failed to prove that decedent

earned any wages from his employment during the fifty-two-week period prior to his death. The

deputy commissioner explained that the federal income tax records for decedent's business

showed that it was operating at a loss over one year prior to his death and that the weekly draws

decedent paid to himself were taken "with the hope that his business would earn enough to allow

him to draw a wage." He concluded that

the records failed to establish that his business earned income in
the year prior to his death *in order to provide a wage* for
[decedent]. Accordingly, we find the evidence fails to establish
any loss of income as the result of [decedent's] death and therefore
the claim for compensation benefits pursuant to [Code]
§ 65.2-512(A) is DENIED.

(Emphasis added).

Claimant appealed the deputy commissioner's denial of her benefits claim to the full

commission. On appeal, the commission reversed the deputy commissioner's ruling. The

commission agreed with the deputy commissioner that the weekly draws from the business did

not constitute wages or earnings because, "to the extent that there was insufficient money to

cover the draws, the draws were treated as loans." The full commission also concluded that "the

money received in draws was taken, not based upon existing profits from the business, but

instead upon the expectation, or hope," never realized in this case, "that there would be sufficient

profits to cover the draws."

The commission nonetheless concluded that "the facts of this case bring it within the provisions of [Code] [§] 65.2-101(1.b.)," which provides that the commission, in "exceptional" cases, may resort to an alternative method of calculating the average weekly wage an employee would earn "'were it not for [his] injury.'" Notwithstanding its determination that decedent's weekly draws did not constitute wage earnings, the commission concluded "[i]t would be inherently unfair and inconsistent with the spirit of the [Act] . . . to find that [claimant] is not entitled to any indemnity benefits simply because the family business had no profit as a result of economic conditions outside of their control." The commission then stated:

> However, in light of the *complete absence of evidence* of what a similar employee would have earned in wages, we must limit [decedent's] earnings to $6.55, the minimum hourly wage at the time of his accident, multiplied by a 40-hour work week, which provides an average weekly wage of $262, resulting in a compensation rate of $223.75, the minimum compensation rate at the time of the accident.

(Emphasis added).

The commission ordered insurer to pay compensation to claimant at the minimum weekly rate of $223.75 for a period of 500 weeks beginning July 23, 2009 and continuing, or until circumstances warranted otherwise.

Dissenting, Commissioner Williams "agree[d] that [Code] [§] 65.2-101(1.b.) provides significant discretion in determining the average weekly wage," but concluded that "inherent in this provision is the requirement that the employee actually be earning some wages or income during the [fifty-two] weeks before the accident. . . . It does not allow the [c]ommission to establish an average weekly wage when the employee was not earning wages during the relevant period." Commissioner Williams stated that, moreover, "in using the 'exceptional reasons' method, the [c]ommission is required to use the method which 'will most nearly approximate the

- 6 -

amount which the injured employee would be earning were it not for the injury.'" Commissioner Williams concluded:

> Here, there is simply no evidence that the weekly amount [decedent] would have earned but for the accident is equal to [forty] hours at the minimum hourly wage. This is a figure simply picked out of the air without regard to the evidence before us. Since [decedent] was a sole proprietor, there was no guarantee that he would receive any wages or income, his earnings being totally dependent upon the profitability of his business.

## II. ANALYSIS

### A.

Insurer seeks reversal of the commission's decision awarding claimant compensation benefits. It argues the commission erred by imputing to decedent an average weekly wage based on the federal minimum hourly wage in effect at the time of his accident. Insurer asserts that the evidence presented proved decedent had no wage earnings during the covered period and that the commission's application of Code § 65.2-101(1.b), under the circumstances presented on this record, was error.

> In reviewing the commission's decision, we are guided by well-settled principles. "It is fundamental that a finding of fact made by the commission is conclusive and binding upon this [C]ourt on review." Commonwealth v. Powell, 2 Va. App. 712, 714, 347 S.E.2d 532, 533 (1986). See also Code § 65.2-706. "[T]hat contrary evidence may be in the record is of no consequence *if there is credible evidence to support the [c]ommission's findings*." Russell Loungewear v. Gray, 2 Va. App. 90, 95, 341 S.E.2d 824, 826 (1986).

Sneed v. Morengo, Inc., 19 Va. App. 199, 204-05, 450 S.E.2d 167, 170-71 (1994) (emphasis added).

"Under the Virginia Workers' Compensation Act, awards of compensation benefits are based upon the average weekly wage." Dinwiddie Co. School Board v. Cole, 258 Va. 430, 432, 520 S.E.2d 650, 651 (1999). The determination of an employee's "average weekly wage"

- 7 -

constitutes a "question of fact to be determined by the [c]ommission which, if based on credible evidence, will not be disturbed on appeal." Pilot Freight Carriers, Inc. v. Reeves, 1 Va. App. 435, 441, 339 S.E.2d 570, 573 (1986).

Code § 65.2-101 provides, in pertinent part:

"Average weekly wage" means:

1.a. The earnings of the injured employee in the employment in which he was working at the time of the injury during the period of [fifty-two] weeks immediately preceding the date of the injury, divided by [fifty-two] . . . .

b. When for exceptional reasons the foregoing would be unfair either to the employer or employee, such other method of computing average weekly wages may be resorted to *as will most nearly approximate the amount which the injured employee would be earning were it not for the injury*.

(Emphasis added).

Here, pursuant to Code § 65.2-101(1.b), the commission chose to use "such other method of computing average weekly wages" to "most nearly approximate the amount which [decedent] would be earning were it not for [his] [death]." It found "[i]t would be inherently unfair . . . to find that [claimant] is not entitled to any indemnity benefits simply because the family business had no profit" for several years, including the fifty-two weeks preceding decedent's death. However, the record on appeal lacks *any evidence* to support the commission's finding that, were it not for his death, decedent, a sole proprietor, "would be earning" the federal minimum wage in effect at the time of his death, multiplied by a forty-hour work week. Code § 65.2-101(1.b). Neither insurer nor claimant produced any evidence that decedent paid himself the federal minimum wage in effect during the fifty-two weeks preceding his death, or that he would have earned the federal minimum wage in the future "were it not for [his] [death]." Id. Indeed, claimant testified that decedent paid himself fluctuating amounts from the draw account in the

- 8 -

fifty-two weeks preceding his death and that the family business had continued to operate at a loss after decedent's death.

The commission's authority under Code § 65.2-101(1.b) to use "such other method of computing average weekly wages" to "most nearly approximate the amount which the injured employee would be earning were it not for the injury" does not permit it to award compensation that is not supported by some credible evidence.[6] See Georgia Pac. Corp. v. Dancy, 17 Va. App. 128, 135, 435 S.E.2d 898, 902 (1993) ("Factual findings of the commission will not be disturbed on appeal unless plainly wrong or without credible evidence to support them."). Accordingly, we reverse the commission's decision awarding claimant compensation benefits at the weekly rate of $223.75 for a period of 500 weeks beginning July 23, 2009 and continuing, or until circumstances warranted otherwise.

B.

In claimant's assignments of cross-error, she contends the commission erred by not calculating decedent's average weekly wage based on the following testimony: (i) that decedent worked seventy to eighty hours per week; (ii) that decedent withdrew money each week from his business, a sole proprietorship, to pay for personal and other expenses; and (iii) that claimant paid wages to other employees to perform some of decedent's work after he died.

(i)

Claimant asserts that her testimony that decedent worked seventy to eighty hours per week was uncontroverted. She thereby asserts that the commission erred by calculating decedent's average weekly wage by multiplying the federal minimum hourly wage, in effect at

---

[6] "Although we adhere to the long-established principle that the [Act] is remedial and must be liberally construed in favor of employees and their dependents, we cannot permit a liberal construction to change the meaning of the statutory language or the purpose of the Act." American Furniture Co. v. Doane, 230 Va. 39, 42, 334 S.E.2d 548, 550 (1985).

the time of his death, by a forty-hour work week. However, because we hold that the commission erred by calculating decedent's average weekly wage based on the minimum hourly wage, when the record was devoid of any evidence that decedent paid himself that amount or would have earned that amount were it not for his death, the number of hours decedent worked each week is irrelevant. Accordingly, we need not address whether the commission erred in using a forty-hour work week, rather than a seventy or eighty-hour work week, to calculate decedent's average weekly wage under Code § 65.2-101(1.b).

(ii)

Claimant also asserts that the commission erred in calculating decedent's average weekly wage based on the federal minimum wage in effect at the time of his death, rather than the amount he withdrew from the sole proprietorship's draw account in the fifty-two weeks preceding his death. Claimant asserts that, as a matter of law, decedent's weekly withdrawals constituted his "wages" and reflected what he "would be earning were it not for [his] [death]" under Code § 65.2-101(1.b).

We review questions of law *de novo*, Wal-Mart v. Poorman, 60 Va. App. 84, 90, 724 S.E.2d 212, __ (2012), "without deference to the decision under review," Thorpe v. Clary, 57 Va. App. 617, 623, 704 S.E.2d 611, 613 (2011), aff'd sub nom. Thorpe v. Ted Bowling Constr., 238 Va. 808, 724 S.E.2d 728 (2012).

The commission rejected claimant's assertion that decedent's weekly draws (i) constituted wages in the fifty-two weeks preceding his death and (ii) reflected what he would be earning were it not for his death because, "to the extent that there was insufficient money to cover [his] draws, the draws were treated as *loans*" to decedent, not wage earnings. (Emphasis added). Relying on its previous unpublished decision in Shaat v. Atlast Bus. Group, LLC, No. 227-81-80 (Va. Workers' Comp. Comm'n Oct. 3, 2007), the commission concluded that "the

money received in draws was taken, not based upon existing profits from the business, but instead upon the expectation, or hope," never realized in decedent's case, "that there would be sufficient profits to cover the draws." In Shaat, the commission concluded that

> [t]he evidence is clear that the claimant did not earn $2500 per week even though he received payments in that amount. . . . The guaranteed draw of $2500 does not most closely approximate the claimant's economic loss. It is a fictional wage, given to the claimant against the hope that the partnership would earn enough to realize that wage.

Id.

Similarly, the commission here found that decedent's weekly draws were not earnings, and at most constituted "a 'fictional wage.'"

We find no error in the commission's determination that decedent's weekly withdrawals from the draw account did not constitute wages under Code § 65.2-101. This Court has previously held that "wages" is a term applied to compensation paid to an employee as consideration for work, which constitutes a real economic gain for the employee. Southwest Architectural Products v. Smith, 4 Va. App. 474, 480, 358 S.E.2d 745, 748 (1987).

Claimant testified that decedent's withdrawals from the draw account in the fifty-two weeks preceding his death constituted loans. She conceded that decedent reported no wage earnings on their 2008 joint federal income tax return precisely because his withdrawals were loans. Leslie Robson, forensic accountant, confirmed that the sole proprietorship operated at a net loss each week in the fifty-two weeks preceding decedent's death and that decedent collected "no wages at all." Under the circumstances present on this record, where decedent's weekly income consisted solely of borrowed funds, we cannot say such income constituted "earnings" for purposes of calculating his average weekly wage under Code § 65.2-101(1.b). See, e.g., id. at 479, 358 S.E.2d at 748 (only "allowances which constitute an economic gain to the employee, as opposed to mere reimbursement for expenses, are included as part of the employee's wage").

- 11 -

Accordingly, the commission did not err in declining to calculate decedent's average weekly wage based on the amount of his weekly draws.

(iii)

Finally, claimant asserts that the commission erred in not considering the salary of an employee she hired to perform some of decedent's job duties as a basis for calculating decedent's weekly wage. The Court will not consider claimant's third assignment of cross-error because of claimant's failure to comply with Rule 5A:21.[7]

III. CONCLUSION

Here, claimant produced no evidence that decedent, a sole proprietor, had any wage earnings or its equivalent in the fifty-two weeks preceding his death, or that he would have earned any wages in the future "were it not for [his] [death]." Code § 65.2-101(1.b). The commission's determination under Code § 65.2-101(1.b) that decedent would have earned $262 per week "were it not for [his] [death]" was without credible evidence to support it. See United Airlines, Inc. v. Sabol, 47 Va. App. 495, 500, 624 S.E.2d 692, 694 (2006).

Accordingly, we reverse the judgment of the commission and enter final judgment.

Reversed.

---

[7] Rule 5A:21 provides, in pertinent part, that appellee's brief "shall contain . . . [t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Rule 5A:21(d). Claimant discloses no standard of review, principles of law, or authorities relating to her third assignment of cross-error. See Appellee's Br. at 21. Claimant's failure to comply with Rule 5A:21 is significant. Accordingly, the Court will not consider her third assignment of cross-error. See Fadness v. Fadness, 52 Va. App. 833, 851, 667 S.E.2d 857, 866 (2008) ("If the parties believed that the circuit court erred, it was their duty to present that error to us with legal authority to support their contention.").